(March 6, 1890.)

## DRAKE ET AL. V. EARHART.

[23 Pac. 541.]

PRIOR APPROPRIATION OF WATER—RIPARIAN RIGHTS—SALE OF WATER BY APPROPRIATOR.—Under the law of the territory and of Congress, it has become the settled law that the prior appropriator of water has the better title thereto.

RIPARIAN RIGHTS.—A riparian proprietor whose claim to the use of water of a stream flowing through his land not based upon appropriation under the territorial laws is inferior to that of a prior appropriator.

SALE OF WATER BY PRIOR APPROPRIATOR.—Water legally appropriated may be sold by the owner for other useful purposes when it appears no more was appropriated than the owner could put to a beneficial use.

APPEAL from District Court, Alturas County.

L. Vineyard, for Appellant.

Where error is shown, the presumption is that appellant has been prejudiced by it, and it is incumbent on the respondent to see that the record discloses the fact that the appellant has not been so prejudiced. (*Norwood v. Kenfield,* 30 Cal. 393; *Jackson v. Water Co.,* 14 Cal. 18.)

F. E. Ensign and Lyttleton Price, for Respondents.

The right of a prior appropriator to water appropriated for a beneficial use is superior to that of a riparian owner of land, who became the owner after the appropriation. (*Osgood v. Water etc. Co.,* 56 Cal. 571; *Farley v. Mining etc. Co.,* 58 Cal. 142; *Himes v. Johnson,* 61 Cal. 259; *Barney v. Sabron,* 10 Nev. 217; *Lux v. Haggin* (Cal.), 4 Pac. 924; *Water Co. v. Perdew* (Cal.), 4 Pac. 426; *Judkins v. Elliott* (Cal.), 12 Pac. 116; *Kaler v. Campbell,* 13 Or. 596, 11 Pac. 301; *Ware v. Walker,* 70 Cal. 591, 12 Pac. 475; *Hill v. Lenormand* (Ariz.), 16 Pac. 266; *Clough v. Wing* (Ariz.), 17 Pac. 453; *Elles v. Improvement Co.,* 1 Wash. 572, 21 Pac. 27; *Geddis v. Parrish,* 1 Wash. 587, 21 Pac. 314.) If a judgment is irregular, the proper practice is to move to correct it in the court be-

low. (*Fox v. West,* 1 Idaho, 784; *Anderson v. Parker,* 6 Cal. 201; *Leviston v. Swan,* 33 Cal. 480.)   Defects in form or explicitness in findings should be objected to in the court below. (*Parke v. Hinds,* 14 Cal. 415.)   A judgment will not be reversed for any error therein which the records will enable the appellate court to fully correct.   The judgment will be modified and affirmed. (*Union Water Co. v. Murphy's Flat Fluming Co.,* 22 Cal. 620; *Persse v. Cole,* 1 Cal. 369; *Gahan v. Neville,* 2 Cal. 81.)

BEATTY, C. J.—In the year 1879 respondent Quigley took possession of a tract of unsurveyed land at the mouth of what has since been known as "Quigley gulch," near the town of Hailey, in Alturas county, and at the same time appropriated for the irrigation of said land the water of the stream flowing down said gulch; and the other respondents Drake and Covert, subsequently became owners in a part of said land and water. At later dates the several defendants in this action became possessed of certain lands lying upon said stream farther up the gulch, and commenced the use of the said water.   To perpetually restrain them from such use, this action was commenced; and, upon the trial before the court, the right to the water was adjudged to respondents, and defendants were restrained and enjoined from using any thereof.   From this judgment the appellant Earhart alone has appealed to this court.

From the findings of the court it appears that in 1879 said Quigley located the land referred to, and afterward he and said Drake, who had purchased a part, obtained patents therefor, and, so far as the findings show, still own it; that "in said year 1879, said Quigley took out of said Quigley creek, a stream flowing in said gulch, by a ditch built by him upon said land, all the waters flowing therein, and caused the same to flow upon a portion of said land"; that, "at the time of appropriation of said water as aforesaid, said Quigley posted a notice . . . . claiming six hundred inches of the water of said stream"; and the court also found "that said stream carries one hundred and fifty ·inches of water"; that afterward said Drake and Covert succeeded to all the water, and the three respondents "continued . . . . to use said water of said stream for agricultural purposes ·upon the land before mentioned"; that they have at all times as-

serted title to all of said water; that none of the defendants had ever made any appropriation of any of said water in pursuance of the laws of this territory; that "irrigation is necessary to the proper cultivation of the lands of all the parties, and all the waters of said stream are required for the irrigation of the lands of plaintiffs." It appears from Earhart's answer that he purchased his land in 1885, and that it had been occupied by his grantor since May, 1883. The appellant suggests the insufficiency of the findings. While they are not explicit, if they will support the judgment, they must not be disturbed. They show the respondents together own the land and water, the latter by prior appropriation; that they use it to irrigate this land, for which all the stream is used. They do not specify under what pressure the water is measured; but, as all in the stream is required by them, and as there are but one hundred and fifty inches therein, being four hundred and fifty less than was claimed by the act of appropriation, it cannot be discovered how, in this case, the failure to specify the pressure can result in injury to the appellant.

It is also found by the court "that some time in the year 188—, before the commencement of this action, plaintiffs Drake and Quigley sold a small quantity of said water to the Oregon Short Line Railway for a water supply at its station at Hailey." From the fact that respondent so sold a portion of said water, it is argued that they had attempted the appropriation of more than they needed for a "useful or beneficial purpose." It is, unquestionably, the law that more than is required for such purpose cannot be taken; that, when legally appropriated, it may be sold for some other useful purpose; and that its use for railroad necessities is such a purpose. Did respondents sell what they did not need? It appearing that in 1879 all the water of this stream was sufficient to irrigate but a part of the land now owned by respondents, it follows that the sale of the water was not from an unneeded surplus, but from that which they had actual use for. It is their privilege to dispose of what they need, if they desire. Its sale did not damage appellant, nor could its retention by them have benefited him. How the conveyances of this land and water were made, or by what arrangements the respondents together use them, does not appear,

and, it not appearing to have been a matter of contest below, is immaterial here. The findings support the judgment.

The important question, for the settlement of which this appeal was chiefly brought, is what, if any, rights the appellant has to any of that water as a riparian proprietor. His claim is not based upon prior or any appropriation under our territorial laws, but upon the fact that the stream in question flows by its natural channel through his land; hence, that he is entitled to the use thereof allowed by the common law. This doctrine of riparian proprietorship in water as against prior appropriation has been very often discussed, and nearly always decided the same way by almost every appellate court between Mexico and the British possessions, and from the shores of the Pacific to the eastern slope of the Rocky Mountains, as well as by the supreme court of the United States. But for the fact that it has elsewhere repeatedly appeared in the same court, it would seem surprising that it should now be seeking another solution in this. While there are questions growing out of the water laws and rights not fully adjudicated, this phantom of riparian rights, based upon facts like those in this case, has been so often decided adversely to such claim, and in favor of the prior appropriation, that the maxim, "First in time, first in right," should be considered the settled law here. Whether or not it is a beneficent rule, it is the lineal descendant of the law of necessity. When, from among the most energetic and enterprising classes of the east, that enormous tide of emigration poured into the west, this was found an arid land, which could be utilized as an agricultural country, or made valuable for its gold, only by the use of its streams of water. The new inhabitants were without law, but they quickly recognized that each man should not be a law unto himself. Accustomed, as they had been, to obedience to the laws they had helped make, as the settlements increased to such numbers as justified organization, they established their local customs and rules for their government in the use of water and land. They found a new condition of things. The use of water to which they had been accustomed, and the laws concerning it, had no application here. The demand for water they found greater than the

supply, as is the unfortunate fact still all over this arid region. Instead of attempting to divide it among all, thus making it unprofitable to any, or instead of applying the common-law riparian doctrine, to which they had been accustomed, they disregarded the traditions of the past, and established as the only rule suitable to their situation that of prior appropriation. This did not mean that the first appropriator could take all he pleased, but what he actually needed, and could properly use without waste. Thus was established the local custom, which pervaded the entire west, and became the basis of the laws we have to-day on that subject. Very soon these customs attracted the attention of the legislatures, where they are approved and adopted, and next we find them undergoing the crucial test of judicial investigation. As far back as 1855, the supreme court of California, in *Irwin v. Phillips,* 5 Cal. 145, 63 Am. Dec. 113, and in *Tartar v. Mining Co.,* 5 Cal. 397, distinctly held that the prior appropriator of water should hold it against the riparian claim of the owner of land through which it flowed, and, also, that in all branches of industry the prior appropriator of land, water and easements would be protected. Not only had such become the law by custom, by the legislative will and the decisions of the courts, without dissent, but the general government for many years, without protest, acquiesced in such occupation and use of its lands and waters by its citizens, while valuable properties and industries were building upon this principle. To put the question beyond uncertainty, to approve and adopt what already existed as the common law of the west, the Congress, by its act of July 26, 1866, section 9, provided "that whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing or other purposes have vested and accrued, and the same are recognized and acknowledged by the local customs, laws and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same." It will be observed that the act is based upon the existence of local customs, laws and decisions of courts. It is not necessary that all these conditions shall exist for the protection of the right; but, as held in *Basey v. Gallagher,* 20 Wall. 684, the existence of either condition is sufficient.

It has been said that in the case at bar no custom has been shown. It is not necessary it should be; for, prior to the beginning of appellant's claim, the superior rights of prior appropriation were acknowledged by our territorial law of 1881, and by the decisions of our courts. By a practically unbroken line of decisions the rule of the cases above referred to in 5 Cal., has been followed, and is now established by so many and such high authorities that it would seem this theme of discussion is exhausted. Brief reference, however, may be made to some of the leading cases. *Basey v. Gallagher,* 20 Wall. 681, 682, clearly indorses the superior right of prior appropriation between agricultural claimants in the following explicit language: "In the late case of *Atchison v. Peterson* [20 Wall. 507], we had occasion to consider the respective rights of miners to running waters on the mineral lands of the public domain; and we there held that, by the custom which had obtained among miners in the Pacific states and territories, the party who first subjected the water to use, or took the necessary steps for that purpose, was regarded, except as against the government, as the source of title in all controversies respecting it; that the doctrines of the common law declaratory of the rights of riparian proprietors were inapplicable, or applicable only to a limited extent, to the necessities of miners, and were inadequate to their protection; that the equality of right recognized by that law among all the proprietors upon the same stream would have been incompatible with any extended diversion of the water by one proprietor, and its conveyance, for mining purposes, to points from which it could not be restored to the stream; that the government, by its silent acquiescence, had assented to and encouraged the occupation of the public lands for mining; and that he who first connected his labor with property thus situated, and open to general exploration, did, in natural justice, acquire a better right to its use and enjoyment than others who had not given such labor; that the miners on the public lands throughout the Pacific states and territories, by their customs, usages and regulations, had recognized the inherent justice of this principle, and the principle itself was at an early period recognized by legislation, and enforced by the courts of those states and territories, and was

finally approved by the legislation of Congress in 1866. The views there expressed, and the rulings made, are equally applicable to the use of water on the public lands for purposes of irrigation. No distinction is made in those states and territories, by the custom of miners or settlers or by the courts, in the rights of the first appropriator from the use made of the water, if the use be a beneficial one." In this case it is said: "The right of the first appropriator, exercised within reasonable limits, is respected"; that it "is not unrestricted. It must be exercised with reference to the general condition of the country, and the necessities of the people." This language has been seized upon as justifying the equitable, if not equal, division of the water among all desiring or needing it, regardless of the claim of the prior appropriator. Such a construction is not justified, and would make the decision inconsistent with itself, as well as with the other decisions of the same court. (*Jennison v. Kirk*, 98 U. S. 461; *Broder v. Water Co.*, 101 U. S. 276.) It is evident that all the court means by this language is that the first appropriator shall not be allowed more than he needs for some useful purpose; that he shall not, by wasting or misusing it, deprive his neighbor of what he has not actual use for. In *Jennison v. Kirk, supra,* the court says: "The owners of a mining claim and the owner of a water right enjoy their respective properties from the dates of their appropriation—the first in time being the first in right; but, where both rights can be enjoyed without interference with or material impairment of each other, the enjoyment of both is allowed." It clearly follows, as the courts have certainly held, that when all cannot use the water without injury to the prior appropriator the other must yield to his superior right. The claim having been asserted that, when a party procured a patent for land, he would be entitled to the use of all waters flowing through the same, this was put at rest by the act of Congress of July 9, 1870, as follows: "Sec. 17. All patents granted, or pre-emption or homesteads allowed shall be subject to any vested and accrued water rights or rights to ditches," etc. Since this act the rulings have been uniform that the patentee of land has no claim upon the water flowing through the same as against a prior appropriator. (*Barnes v. Sabron*, 10 Nev.

230; *Hill v. Lenormand* (Ariz.), 16 Pac. 267, 268; *Geddis v. Parrish,* 1 Wash. 587, 21 Pac. 314; *Reno etc. Reduction Works v. Stevenson,* 20 Nev. 269, 19 Am. St. Rep. 364, 21 Pac. 318; *Hammond v. Rose,* 11 Colo. 524, 7 Am. St. Rep. 258, 19 Pac. 466; *De Necochea v. Curtis,* 80 Cal. 397, 20 Pac. 563, 22 Pac. 198; *Malad Val. Irrigation Co. v. Campbell,* ante, p. 411, 18 Pac. 52; *South Yuba etc. Min. Co. v. Rosa,* 80° Cal. 334, 22 Pac. 222.)

While there are numerous questions growing out of the water law, we have aimed to confine this discussion to that involved in this case, which is simply a contest between a prior appropriator of the water of a stream, all of which he claims, has used and needs for a useful purpose, and a party who, since such appropriation, has entered and patented some of the land through which such water, by its natural channel, flows, and who claims its use as a riparian proprietor. In accord with the authorities, as well as with our local law on this subject, it must be held that the judgment of the lower court should be affirmed; and it is so ordered.

BERRY, J., Dissenting.—This action was brought in the court below to restrain the defendants from the use of any of the waters of a stream in Quigley gulch, on the east side of Wood river, and near the city of Hailey. The plaintiffs sue jointly, as prior appropriators of the water of that stream for agricultural purposes. The defendants are occupants of lands lying above the plaintiffs' on that stream, and through which lands of the defendants the stream runs. Judgment was given for the plaintiffs, declaring them jointly to be the absolute "owners of, and entitled to the use of, all the waters flowing in Quigley gulch," without reference to its amount, or to the purposes for which it was diverted, or owned by them, or is to be used; and the defendants are, and each of them is, enjoined from diverting or using any of the waters of said stream; and for costs against the defendants, in the sum of $270. There was no motion for a new trial, and no statement of the case made, and the case comes up upon the judgment-roll alone. It is claimed that the judgment-roll discloses errors for which the judgment should be reversed, and

that the judgment in itself is erroneous, in declaring the plaintiffs the exclusive owners of all the waters of the stream, and restraining the defendants from any use thereof, "notwithstanding it discloses that the water flows through the lands of the defendant Earhart."

I shall attend, firstly, to the first point made—namely, that the judgment-roll discloses errors for which the judgment should be reversed. A liberal construction of the complaint may, perhaps, warrant the findings of fact made by the court, though it goes no further than that. It claims that the stream carries one hundred and fourteen inches of water. The findings of fact are as follows: "1. In the autumn of the year 1879, William G. Quigley located a piece of government land near the mouth of Quigley gulch, in the Wood River valley, in the county of Alturas and territory of Idaho. The land being then unsurveyed public domain, he was at that time unable to purchase the same from the United States, but afterward, upon the same being surveyed and coming in the market, he and the plaintiff Drake, to whom Quigley had sold a part of the lands originally claimed by him, entered the same at the United States land office at Hailey and afterward took patents therefor. In said year 1879 said Quigley took out of Quigley creek, a stream flowing in said gulch, by a ditch built by him upon said land, all the waters flowing therein, and caused the same to flow upon a portion of said land, and in the same year built a house, and continued to reside on said land from that time until the commencement of this action. At the time of appropriation of said water as aforesaid, said Quigley posted a notice at the point of diversion of said water in which he claimed six hundred inches of the water of said stream for agricultural purposes; that said stream carries one hundred and fifty inches of water. 2. Afterward, and before the commencement of this action, the plaintiff Drake succeeded to one-half of all the waters claimed and owned by said Quigley, and the plaintiff Covert succeeded to the other half thereof; and said plaintiffs, Drake and Covert, and said Quigley continued, except for the trespass and unlawful diversions of said water by the defendants hereinafter mentioned, to uninterruptedly use the waters of said stream for agricultural purposes upon

the land before mentioned. 3. That some time in the year 188—, before the commencement of this action, plaintiffs Drake and Quigley sold a small quantity of said water to the Oregon Short Line Railway Company for a water supply at its station at Hailey. 4. At several times since the year 1881, parties not connected with this suit have, for the purpose of supplying certain brickyards situate near said stream, taken small quantities of the water thereof to supply brickyards for short periods of time, in some instances with the consent of Quigley, while he was an owner thereof, and at other times without the consent of any one of the plaintiffs. 5. The defendant occupies a several and distinct piece of land above the point of diversion by plaintiffs, and the lands owned by them, through which lands of defendants said stream flows in its natural channel. 6. That defendants, and each of them, have taken out of said stream, at various times, quantities of water in ditches constructed by them and their predecessors, and used the same for irrigating their lands, to which use the plaintiffs have objected and defendants have at all times been informed of and have known that plaintiffs asserted title to all the water flowing in said stream; and plaintiffs have many times torn out the dams constructed by defendants, and turned the water from their ditches back into the stream, and caused the water to flow down into the plaintiffs' ditches, and upon their lands. 7. None of the defendants have been in the actual adverse possession of the water of said stream, nor of any part thereof, for the period of five years next before the commencement of this suit. 8. None of the defendants at any time ever posted any notice claiming any of the waters of said stream, nor did they, or any of them, comply, or attempt to comply with any of the provisions of the act of the Idaho legislature of February 10, 1881, in relation to water rights, with a view to acquire the right to the use of any of the waters of said stream. 9. Irrigation is necessary to the proper cultivation and the raising of crops upon the lands of all the parties to this action, and all the waters of said stream are required for the irrigation of the lands of the plaintiffs."

These are all of the findings of fact. No custom as to the use of water is alleged or found, and the appellant contends

that these facts are insufficient to sustain a judgment for the plaintiffs. He says that custom, and custom alone, where right exists to use water for irrigating purposes on the public domain, must be shown as the basis of that right; that it must be alleged and shown, and, of course, must be found. That is the law. Custom is indispensable to the plaintiffs' right. Such right is founded on custom and user. (14 U. S. Stats. at Large, p. 253, sec. 9; *Basey v. Gallagher,* 20 Wall. 683.) But nothing of the kind exists here. We might go no further, and, resting on this, the judgment is not sustained. But the counsel goes further. He insists that the respondents, and each of them, fails to show that he has, or ever had, lands to irrigate requiring six hundred inches of water, or any other amount. The court seems to have properly assumed that the right to divert water for agricultural purposes depends upon having some parcel of land to irrigate. Such is, unquestionably, the law. The decisions of the court are uniform on that point; also the statutes of Idaho (chapter 1, title 9). Covert does not seem to have had any land at any time. Quigley in 1879 is found to have occupied "a piece" somewhere at or near the mouth of the gulch, but there is no intimation as to how much—whether one acre or one hundred acres; nor is there any definite location or description of it. Water was conducted onto "a part" of this "piece"; but whether upon that part which Quigley sold to Drake, and which Drake got a patent for, or upon that which Quigley retained, does not appear. At the same time, Drake and Quigley appear to have held their lands in severalty. Drake entered his land, whatever it was, at the land office after 1879, presumably after the act of February 10, 1881; but, whenever it was, he is not shown to have been in the use of any waters at that time. After such purchase from the United States, the lands were not government domain, but any considerable appropriation of water by him must have been under the statute of Idaho. He did nothing, under that statute or otherwise, at any time, tending to constitute an appropriation by him. Neither did Covert.

In the second finding it is said that at some time not specified "Drake succeeded to 'one-half' of all the waters claimed

and owned by Quigley, and the plaintiff Covert succeeded to the other half." By what means they "succeeded," whether by abandonment by Quigley and reappropriation by Drake and Covert, or by sale by Quigley to them, of the lands on which the water was used, or by sale of the water alone, does not appear. Presumably, if such be the fact, it should have been by lawful claim by them for irrigating agricultural lands; and no such act of appropriation was done by either. But, whether Quigley devested himself of his assumed right by abandonment or otherwise, it is certain that Quigley had nothing remaining from the time Drake and Covert succeeded, one to "one-half" and the other "to the other half," of his rights. His interest was ended. He is out of the case, and yet the judgment is in his favor. As neither Drake nor Covert are in any way shown to have had at any time any interest whatever in, or right to use, this water, or any part of it, for agricultural or for any other purpose, all of the plaintiffs are out of court; and yet the judgment is in favor of all of them jointly. It is therefore impossible, in this case, to reach what might otherwise be the principal and more important question involved in the judgment—namely, whether such a claim as the plaintiffs made to absolute ownership for agricultural purposes of the waters of a natural stream of the country, to the entire exclusion of all other settlers on the same stream, whose lands require irrigation, and to whom water is one of the necessaries of life, and through whose lands that stream may run, can, under our laws, be maintained. The facts found not being sufficient to sustain the conclusions of law or judgment, it follows that the judgment as to the appellant should be reversed.

There is no room for any presumption that other prerequisites to a valid judgment existed. Indeed, it is shown affirmatively that the necessary grounds did not exist. Here, then, I think this case should end. What may be further said on the question of rights of parties diverting water upon lands for purposes of irrigation can have no binding force. There is no case before the court warranting a discussion of the subject. Such discussion may be taken as *obiter,* merely. But the majority opinion goes into it, and I may be excused for follow-

ing its example, so far as the little time allowed me will permit.

1. The assumptions, in the majority opinion, of facts as drawn from the findings, or as properly deducible from those findings, I, for the most part, controvert. The findings of fact are hereinbefore stated in full, and they speak for themselves.

2. Nor do I admit that posting a notice on a stream, prior to 1881, claiming six hundred inches of water, was "an act of appropriation." It had nothing to do with "an act of appropriation on the public domain." That could only be done on the public domain by having lands to irrigate; *second,* by actually diverting waters upon it, by means sufficient to conduct all the water actually appropriated. There is nothing of that kind in this case, and the court is not warranted in assuming that there is.

3. The majority opinion pronounces the claim of a person whose lands lie upon a stream as resting on the "phantom of riparian rights." I deny that under the laws of this territory "riparian rights" are a "phantom," unless unlawfully and unjustly made so. The doctrine of riparian rights is a part of the common law; and the common law is the law of this territory, except as the statute steps in, and repeals or changes it. Section 18 of the Revised Statutes so declares. It provides that "the common law of England, so far as it is not repugnant to or inconsistent with the constitution or laws of the United States, in all cases not provided for in these Revised Statutes, is the rule of decision in all the courts in this territory." The United States statutes have in some respects modified the common-law rule of riparian rights on the public domain where customs are shown to exist, and not otherwise. No customs are pretended here. Indeed, all customs are studiously ignored. The statutes of the territory previous to 1881 had no provision whatever on the subject of water rights. But in 1881 what are equivalent to common-law water rights were in some respects expressly affirmed, only those rights were enlarged. Section 3180 of the Revised Statutes provides that "all persons, companies and corporations owning or claiming any lands situated on the banks or in the vicinity of any stream

are entitled to the use of the waters of such stream for the purpose of irrigating the land so held or claimed." In the preceding chapter of the statutes it is provided that by complying with certain conditions (not one of which is pretended to be complied with in this case) a party may entitle himself to superior rights in the use of water. No one denies this fact. But it nowhere provides that anyone may entitle himself to ownership of a stream, or to entirely exclude others "on the banks or in the vicinity of a stream" from some use of the water, as provided in section 3180, above quoted. Our statute is a little more comprehensive—a little stronger, in some respects, in favor of those needing water—than the common law of riparian rights; but it leaves many of those rights intact. It is wrong, then, to designate these common-law rights as a "phantom." They are real, and the interests of our territory demand that they should be recognized.

4. By the common law, running water is not the subject of ownership. No statute of Idaho, nor of Congress, either, makes it such. By custom, when that is shown, a person in its prior use may not be disturbed in its use, providing, as Mr. Justice Field says in *Basey v. Gallagher,* 20 Wall. 683, the custom and claim under it are reasonable. But that is as far as it goes—as far as any statute of the United States or of this territory goes. Our own statutes are in accord with that view. (Idaho Rev. Stats., sec. 3188.) In *Basey v. Gallagher,* 20 Wall. 683, Mr. Justice Field says that "in all such cases the right of the first appropriator, exercised within reasonable limits, is respected and enforced. We say within reasonable limits; for this right to water, like the right by prior occupancy, to mining ground, . . . . is not unrestricted. It must be exercised with reference to the general condition of the country and the necessities of the people, and not so as to deprive a whole neighborhood or community of its use, and to vest an absolute monopoly in a single individual."

. What does this judgment do, but to violate every provision of the foregoing, severally, and as a whole? Is it reasonable to appropriate all the waters of a stream, even if it contains one thousand inches, or whatever it may be, to irrigate "a piece" of land, with no intimation of its description or amount? Is it

reasonable to allow absolute and "unrestricted" ownership in water diverted for purposes of irrigation, only, to be used, as in this case, for sale to railroads and brickyards, or other purposes than irrigation, and still deny to others their natural, lawful, statutory rights in any of it? Where are the "reasonable limits" of such a claim? Is such a claim in accord with "the conditions of the country and necessities of the people," when those people are famishing for water, and precluded from using a drop, though an abundance runs past their doors? Does not this judgment establish "an absolute monopoly of the waters of this stream? Every one of these questions carries with it its own answer. I do not propose to pursue this argument, and show that a great majority of the cases relied on to establish this doctrine of absolute ownership and exclusive monopoly in streams do not relate to the use of water for agricultural purposes at all, but that those cases relate to diversions or use for mining purposes only. That fact may be easily shown, or else that the cases, where they relate to irrigation, are based upon mining cases. There are few of them that are not so founded, even of those cited in the majority opinion. The doctrine of those cases would prevent the settlement upon lands depending on our natural streams, and, as in the case at bar, would drive away half or more of the settlers who have already settled there. This is not for the interest of the territory, and to allow the example of this case to obtain will prove detrimental in other ways than in decreasing our population. The suffering settlers will very soon resort to the demoralizing aid of the ever present "Winchester" or revolver. People will not tolerate such unlawful claims; and the sooner they are abandoned, or reduced, within reasonable bounds, the better it will be for all. This judgment should be reversed.