# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket Nos. 42775/42836

IN THE MATTER OF THE
DISTRIBUTION OF WATER TO WATER
RIGHT NOS. 36-02551 & 36-07694
(RANGEN, INC.) IDWR DOCKET CM-DC-
2011-004.

RANGEN, INC.,

    Petitioner-Respondent and Appellant,

v.

THE IDAHO DEPARTMENT OF WATER
RESOURCES, GARY SPACKMAN, in his
official capacity as Director of the Idaho
Department of Water Resources, and
FREMONT-MADISON IRRIGATION
DISTRICT,

    Respondents-Respondents,

and

IDAHO GROUND WATER
APPROPRIATORS, INC.,

    Intervenor-Appellant and
    Respondent,

and

CITY OF POCATELLO

    Respondent-Appellant and
    Respondent,

and

A&B IRRIGATION DISTRICT, BURLEY
IRRIGATION DISTRICT, MILNER
IRRIGATION DISTRICT, NORTH SIDE
CANAL COMPANY, TWIN FALLS CANAL
COMPANY, AMERICAN FALLS

Boise, December 2015 Term

2016 Opinion No. 33

Filed: March 23, 2016

Stephen W. Kenyon, Clerk

**RESERVOIR DISTRICT #2, MINIDOKA
IRRIGATION DISTRICT,**

      **Intervenors-Respondents.**

)
)
)
)
)

---

Consolidated appeals from the District Court of the Fifth Judicial District of the State of Idaho, Twin Falls County.  Hon. Eric J. Wildman, District Judge.

The decision of the district court is <u>affirmed in part and reversed in part</u>.

Brody Law Office, PLLC, Rupert, Haemmerle Law Office, PLLC, Hailey, and May, Browning and May, PLLC, Boise, for respondent and appellant Rangen, Inc. Justin J. May argued.

Racine Olson Nye Budge & Bailey, Chartered, Pocatello, for appellant and respondent Idaho Ground Water Appropriators, Inc. Thomas J. Budge argued.

White & Jankowski LLP, Denver, and A. Dean Tranmer, City of Pocatello, Pocatello, for appellant and respondent City of Pocatello. Sarah Klahn argued.

Honorable Lawrence G. Wasden, Idaho Attorney General, Boise, for respondents Idaho Department of Water Resources and Gary Spackman. Garrick L. Baxter argued.

Rigby, Andrus & Rigby, Rexburg, for respondent Fremont-Madison Irrigation District. Jerry R. Rigby argued.

Barker Rosholt & Simpson, LLP, Twin Falls, for respondents A&B Irrigation District, Burley Irrigation District, Milner Irrigation District, North Side Canal Company and Twin Falls Canal Company.

Fletcher Law Office, Burley, for respondents American Falls Reservoir District #2 and Minidoka Irrigation District. W. Kent Fletcher argued.

---

J. JONES, Chief Justice

      The Idaho Ground Water Appropriators, Inc. ("IGWA") and the City of Pocatello filed separate appeals from a district court order, affirming in part and vacating in part an order issued by the Director of the Idaho Department of Water Resources ("IDWR") that curtailed junior ground water pumping in the Eastern Snake Plains Aquifer ("ESPA"). On December 13, 2011,

Rangen, Inc. petitioned for a delivery call, alleging that junior ground water pumping in the ESPA was materially injuring its water rights sourced from the Martin-Curren Tunnel. The Director held an evidentiary hearing from May 1 to May 16, 2013. As relevant to these appeals, the Director concluded that the Martin-Curren Tunnel was a surface water source and, therefore, not subject to the Ground Water Act. Additionally, the Director found that ground water pumping in the ESPA was materially injuring Rangen's water rights and that a curtailment order was appropriate. However, the Director concluded that the benefits of curtailment diminished significantly if the order extended to pumping east of a volcanic rift zone in the ESPA known as the Great Rift. The Director issued a curtailment order on January 24, 2014, mandating that ground water users located west of the Great Rift, with water rights junior to Rangen's, refrain from diverting water from the ESPA.

Rangen and IGWA petitioned for judicial review of the Director's decision. The district court upheld the Director's decision in significant part but vacated the Director's application of a trim line at the Great Rift, concluding that the Director did not have a legal basis to apply a trim line in this case. Rangen, IGWA, and Pocatello each timely appealed. Pocatello appeals the district court's order vacating the Director's application of the Great Rift trim line, alleging that the trim line should be upheld. IGWA appeals the district court's affirmance of the Director's ruling that Rangen's water source should be administered as surface water. Additionally, IGWA alleges that the district court should have vacated the Director's application of the Great Rift trim line on the basis that the curtailment area was overly broad and ordered the Director to set a smaller curtailment area. IGWA also argues that the Director erred by not providing a reasoned statement to support the curtailment order.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

### A. Rangen's Water Rights and the Eastern Snake Plain Aquifer

Rangen owns and operates a fish research and propagation facility at the head of Billingsley Creek in the Thousand Springs area near Hagerman, Idaho. Rangen holds five water rights for the Rangen facility that were decreed through the Snake River Basin Adjudication ("SRBA"). Rangen's petition for delivery call alleged injury only to water right nos. 36-02551 and 36-07694. Water right no. 36-02551 authorizes a diversion of 48.54 cfs for fish propagation and has a priority date of July, 13, 1962. Water right no. 36-07694 authorizes a diversion of 26 cfs for fish propagation and has a priority date of April 12, 1977. The source element for water

3

rights nos. 36-02551 and 36-07694 is the Martin-Curren Tunnel, tributary Billingsley Creek. The Martin-Curren Tunnel, also commonly referred to as the Curren Tunnel, is a large, excavated conduit constructed high on the canyon rim that extends 300 feet into the canyon wall. Water running through the Curren Tunnel is fed by the ESPA.

The ESPA is the aquifer underlying the Eastern Snake Plain. The ESPA is about 170 miles long and 60 miles wide, and is defined as an area having a common ground water supply. IDAPA 37.03.11.050. The ground water in the ESPA is hydraulically connected to the Snake River and tributary springs, including the Thousand Springs area where the Curren Tunnel is located. The ESPA is highly productive and is composed predominantly of fractured quaternary basalt, which is generally characterized by high hydraulic conductivity. The amount of water that discharges from the aquifer to hydraulically connected surface water sources is largely dependent on ground water elevations and hydraulic conductance. From October 1980 through September 2008, average annual discharge from the ESPA exceeded average annual recharge by 270,000 acre feet, which resulted in declining aquifer water levels and declining discharge to the Snake River and tributary springs. Rangen claims that the discharge from the Curren Tunnel has declined significantly due to ground water pumping in the ESPA. Rangen brought this delivery call seeking to have junior priority ground water pumping in the ESPA curtailed in order to increase discharge to the Curren Tunnel.

## B. Development of ESPAM

The Enhanced Snake Plain Aquifer Model ("ESPAM") is a calibrated regional ground water model representing the ESPA, meant to simulate the effects of ground water pumping from the ESPA on the Snake River and tributary springs. ESPAM 1.0 was developed by IDWR and the Eastern Snake Hydrologic Modeling Committee ("ESHMC"). Rangen had filed its first petition for delivery call in September 2003. A curtailment order was issued in February 2004, but it was withdrawn after ESPAM version 1.0 was released. Based on projections from ESPAM 1.0, former Director Karl Dreher found that Rangen's delivery call was futile because curtailment of junior ground water rights in the ESPA would not result in a meaningful increase in the quantity of water discharging near the Rangen Facility. Following Rangen's prior delivery call, ESPAM 1.0 was superseded by ESPAM 1.1, which was used in the delivery call proceedings instituted by Clear Springs Foods and Blue Lakes Trout Farm, Inc. to estimate the effects of ground water pumping on springs in the Thousand Springs area.

4

ESPAM 1.0 and 1.1 were able to predict water flows only within a particular spring reach, rather than a particular source. In delivery calls that used these versions of ESPAM, the present and former Directors had set a "trim line" to limit the area of curtailment to areas in which at least 10% of the water accrued from curtailment would accrue to the spring reach where the caller's point of diversion was located. Much of the water accumulated to the particular spring reach would accrue at locations other than the caller's point of diversion. For example, in the Clear Springs Foods delivery call, the trim line limited curtailment to areas in which at least 10% of the water accrued from curtailment would accrue to the Buhl to Thousand Springs reach. It was estimated that Clear Springs Foods would receive 6.9% percent of the benefit accruing to that reach. Therefore, with the application of the trim line, Clear Springs Foods was predicted to receive 0.69% of the water accrued as a result of the curtailment. Similarly, in the Blue Lakes delivery call, the Director limited the curtailment order to areas where at least 10% of the water accrued from curtailment would accrue to the Devil's Washbowl to Buhl reach. It was predicted that Blue Lakes Trout Farm would receive 20% of the benefit accruing to that reach. Therefore, with the application of the trim line, Blue Lakes was predicted to receive 2% of the water accrued as a result of the curtailment.

In 2005, ESHMC and IDWR began developing ESPAM 2.0. This version was more refined and was calibrated using monthly water levels and flow targets, including measured spring discharges within fourteen specific model grid cells. The springs captured and used by Rangen were measured throughout the model calibration period and the monthly spring discharge in the model cell where spring flows are captured by Rangen was a target for model calibration. This revision to ESPAM was in progress in 2011 when Rangen filed its instant petition, and the parties agreed to wait until the model was updated before going to hearing.

During the development of ESPAM 2.0 it was discovered that the values used to measure the discharge for Thousand Springs for calibration of ESPAM 1.0 were inaccurate, and the values were corrected in the calibration targets for ESPAM 2.0. These corrections resulted in a significant increase in spring discharge targets in the Billingsley Creek Area, and, based on this new information, Rangen challenged the previous determination of a futile call under ESPAM 1.0. The model was re-calibrated in November 2012, resulting in the release and adoption of ESPAM 2.1, which was subsequently used in this proceeding to simulate the effects of ground water pumping in the ESPA on flows available at the Rangen Facility.

## C. Rangen's Delivery Call

On December 13, 2011, Rangen, Inc. filed a petition for delivery call alleging that junior priority ground water pumping in the ESPA was materially injuring its water rights and requested that the Director distribute water in the ESPA and curtail junior priority pumping. IGWA intervened in the proceedings, while Pocatello and Fremont-Madison Irrigation District were brought in as respondents. Additionally, A&B Irrigation District, American Falls Reservoir District #2, Burley Irrigation District, Milner Irrigation District, Minidoka Irrigation District, North Side Canal Company and Twin Falls Canal Company (collectively, the "Surface Water Coalition") intervened in the action to address the application of ESPAM 2.1 in the delivery call.

Prior to the hearing on the delivery call, Rangen filed a motion for partial summary judgment. As relevant to this appeal, Rangen asked the Director to rule that the source for its water rights, the Martin-Curren Tunnel, should be administered as surface water not ground water. The Director agreed with Rangen and ruled that the Curren Tunnel was a surface water source and, therefore, was not subject to the provisions of the Ground Water Act. The Director presided over the evidentiary hearing on Rangen's delivery call, which was held from May 1 through May 16, 2013. The Director then issued an order on January 29, 2014, mandating curtailment of ground water rights bearing priority dates later than July 13, 1962, with points of diversion located both within the area of common ground water supply and west of the Great Rift.

## D. The Curtailment Order

The Director concluded that several factors contributed to the decline in water flow to the Rangen facility, including ground water pumping in the ESPA, and that ground water pumping in the ESPA was materially injuring Rangen's senior water rights. In determining what effect curtailment of ground water pumping would have on discharge to the Curren Tunnel, the Director relied on ESPAM 2.1. The Director concluded that ESPAM 2.1 was the best available scientific tool for predicting the effects of ground water pumping on discharge at the Rangen spring cell. Unlike ESPAM 1.0 and 1.1, ESPAM 2.1 was able to predict the effect of ground water pumping on springs located within a specific model cell rather than the larger spring reach. The Director concluded that 63% of the water that accrued to the Rangen model cell accrued to the Curren Tunnel.

ESPAM 2.1 predicted that the curtailment of all junior ground water pumping in the ESPA, within the area of common ground water supply, would accrue 16.9 cfs of reach gains to the Rangen cell. The benefits of curtailment with respect to the number of acres curtailed diminished significantly where the benefit to the Rangen cell approached 14.3 to 14.6 cfs. As the Director found that 63% percent of the flow into the Rangen cell would accrue to the Curren Tunnel, the Director found that the benefit of curtailment with respect to the number of acres curtailed diminished significantly where the benefit to the Curren Tunnel approached 9.0 to 9.2 cfs. Relying on an analysis by IDWR staff, the Director found that this point of diminishing benefits corresponded with the location of the Great Rift. The Great Rift is a volcanic rift zone within the aquifer that extends north to south across the plain from the Craters of the Moon to just west of American Falls Reservoir. The basalts in this area have low permeability and, therefore, relatively low hydraulic conductivity which can impede the transmission of water through the aquifer.

The Director found that

> Curtailment of junior ground water irrigation west of the Great Rift would curtail irrigation of approximately 157,000 acres, resulting in curtailment of irrigation of approximately 17,000 acres per cfs of predicted benefit to the Curren Tunnel. Curtailment of junior ground water irrigation east of the Great Rift would curtail irrigation of approximately 322,000 additional acres, resulting in curtailment of irrigation of approximately 204,000 acres per cfs of predicted benefit to the Curren Tunnel.

The Director determined that, although there was no way to quantify the margin of error associated with ESPAM 2.1, the model should not be abandoned. Rather, its use should be tempered with the fact that it is a simulation or prediction of reality and uncertainty in the model should be taken into consideration when setting a trim line. The Director found that the uncertainty in the model was higher east of the Great Rift. Additionally, the Director found that ESPAM 2.1 established that the benefits of curtailment diminished significantly east of the Great Rift.

The Director determined that it was within his discretion to apply a trim line and limit curtailment to ground water pumping west of the Great Rift because a senior right holder's demand should be viewed in light of reasonableness and optimum development of water resources in the public interest. Additionally, the Director determined that the uncertainty in ESPAM 2.1 east of the Great Rift also provided a basis for implementing the trim line at that

7

location. Based on these conclusions, the Director implemented a trim line and limited the curtailment order to junior ground water pumping west of the Great Rift. This limited curtailment to an area where the Rangen model cell was predicted to receive at least 1% of the benefits of curtailment and the Curren Tunnel was predicted to receive at least 0.63% of the benefits.

### E.  Proceedings on Judicial Review

IGWA, Rangen, and Pocatello sought reconsideration of the Director's order, including the Director's implementation of the Great Rift trim line. The Director issued an Order on Reconsideration wherein he affirmed the application of the trim line. Rangen and IGWA filed petitions for judicial review of the Director's order. The district court granted motions to intervene filed by Pocatello, Fremont-Madison Irrigation District, and the Surface Water Coalition and the petitions were consolidated. The district court affirmed the Director's order in substantial part, but vacated the Director's application of the Great Rift trim line and remanded for further proceedings. The district court found that the Director did not have a basis to apply a trim line and limit the area of curtailment. IGWA, Rangen, and Pocatello each timely appealed, and the records for the appeals were consolidated. This opinion addresses the appeals of both IGWA and Pocatello, as they both relate to the Director's application of the Great Rift trim line.

## II.
## ISSUES ON APPEAL

### A.  IGWA's Issues on Appeal

1. Whether the Director erred in concluding on summary judgment that the Martin-Curren Tunnel is a surface water source.

2. Whether the Director's implementation of the Great Rift trim line was an abuse of discretion because it results in an overly broad curtailment area.

   a. Whether the Director failed to recognize the issue of whether to implement a trim line as one of discretion.

   b. Whether the Director's application of the Great Rift trim line results in a waste of water.

   c. Whether the Director failed to account for model error when implementing the trim line.

3. Whether the Director failed to provide a reasoned statement to support the curtailment order.

### B.  City of Pocatello's Issue on Appeal

1. Whether the district court erred in setting aside the Great Rift trim line.

8

**III.**
**STANDARD OF REVIEW**

In an appeal from a district court where the court was acting in its appellate capacity under the Idaho Administrative Procedure Act ("IDAPA"), "we review the decision of the district court to determine whether it correctly decided the issues presented to it." *Clear Springs Foods v. Spackman*, 150 Idaho 790, 797, 252 P.3d 71, 78 (2011) [hereinafter "*Clear Springs*"]. However, we review the agency record independently of the district court's decision. *Spencer v. Kootenai Cnty.*, 145 Idaho 448, 452, 180 P.3d 487, 491 (2008). A reviewing court "defers to the agency's findings of fact unless they are clearly erroneous," and "the agency's factual determinations are binding on the reviewing court, even when there is conflicting evidence before the agency, so long as the determinations are supported by substantial competent evidence in the record." *A & B Irrigation Dist. v. Idaho Dep't of Water Res.*, 153 Idaho 500, 505–06, 284 P.3d 225, 230–31 (2012). "This Court freely reviews questions of law." *Vickers v. Lowe*, 150 Idaho 439, 442, 247 P.3d 666, 669 (2011).

The district court must affirm the agency action unless it finds that the agency's findings, inferences, conclusions, or decisions are:

(a) in violation of constitutional or statutory provisions;
(b) in excess of the statutory authority of the agency;
(c) made upon unlawful procedure;
(d) not supported by substantial evidence on the record as a whole; or
(e) arbitrary, capricious, or an abuse of discretion.

I.C. § 67-5279(3); *Clear Springs*, 150 Idaho at 796, 252 P.3d at 77. Even if one of these conditions is met, an "agency action shall be affirmed unless substantial rights of the appellant have been prejudiced." I.C. § 67-5279(4).

Discretionary decisions of an agency shall be affirmed if the agency (1) perceived the issue in question as discretionary, (2) acted within the outer limits of its discretion and consistently with the legal standards applicable to the available choices, and (3) reached its own decision through an exercise of reason. *Haw v. Idaho State Bd. of Med.*, 143 Idaho 51, 54, 137 P.3d 438, 441 (2006). "If the agency action is not affirmed, it shall be set aside, in whole or in part, and remanded for further proceedings as necessary." I.C. § 67-5279(3).

**IV.**
**ANALYSIS**

**A. The district court did not err in affirming the Director's conclusion that the Martin-Curren Tunnel was a surface water source.**

Prior to the evidentiary hearing, the Director granted in part Rangen's Motion for Partial Summary Judgment, concluding that the Curren Tunnel was a surface water source. The Director found that water right nos. 36-2551 and 36-7694 were decreed in the SRBA to be from a surface water source and that the SRBA court's finding was conclusive in the delivery call proceeding. The district court affirmed the Director's conclusion on review. IGWA contends that the district court erred in affirming the Director's conclusion because the Curren Tunnel meets the definition of a ground water source under the Ground Water Act and the partial decrees are not conclusive as to whether the Curren Tunnel should be administered as surface or ground water.

In *Clear Springs*, we held that the provisions of the Ground Water Act are not applicable to holders of surface water rights because the Ground Water Act specifically applies only to "appropriators of ground water." 150 Idaho at 804, 252 P.3d at 85. However, we have not previously addressed whether a partial decree issued in the SRBA is conclusive in a delivery call as to whether the senior right holder's source should be administered as surface or ground water.

Chapter 14, title 42, Idaho Code modified the laws and procedures for adjudicating water rights. I.C. § 42-1401. One of the purposes of this modification was "to establish, through an adjudication a uniform description for surface water rights, ground water rights and water rights." I.C. § 42-1427(1)(a). The Legislature found that prior to the enactment of Chapter 14 "existing water rights [were] not uniformly described," and "it is important that the elements of a water right be standardized to allow for fair and efficient administration of the limited water supply." *Id.*

Idaho Code sections 42-1409 and 42-1411 provide that a notice of claim to a water right and the Director's report on the water system must include the "source of water." I.C. §§ 42-1409(1)(b), -1411(2)(b). Although there is no requirement within the statute that the notice or report specifically address whether the source is surface or ground water, IDWR's Adjudication Rule 60 does expressly address this issue.

> For surface water sources, the source of water shall be identified by the official name listed on the U.S. Geological Survey Quadrangle map. If no official name has been given, the name in local common usage should be listed. If there is no official or common name, the source should be described as "unnamed stream" or "spring." The first named downstream water source to which the source is tributary shall also be listed. For ground water sources, the source shall be listed as "ground water."

IDAPA 37.03.01.060.02(c)(i).

Here, the partial water decrees at issue identify the water source as Martin-Curren Tunnel and the tributary as Billingsley Creek. The Director found that because the decrees followed the naming conventions in Adjudication Rule 60 for surface water sources, a plain reading of the decrees shows that the Martin-Curren Tunnel is unambiguously surface water. The district court affirmed this conclusion, reasoning that if the source of Rangen's senior rights was ground water, the SRBA Court would have decreed the source as "ground water," the same as every other ground water right in the SRBA. The district court then concluded that if IGWA disagreed with the Department's recommendations, it should have timely file objections to the recommendations in the SRBA rather than collaterally attacking the partial decrees in this delivery call proceeding.

IGWA argues that the Director erred in relying on Adjudication Rule 60 because the rule was merely meant to facilitate uniformity in naming water sources and the name of the senior's source is not conclusive of how water rights will be administered in response to a delivery call. In support of this argument, IGWA relies on *Am. Falls Reservoir Dist. No. 2 v. Idaho Dep't of Water Res.*, 143 Idaho 862, 154 P.3d 433 (2007) [hereinafter "*AFRD2*"]. There, the Court held that the SRBA court's issuance of partial decrees did not prevent the Director from considering the material injury factors in the Conjunctive Management Rules during a delivery call because the SRBA did not address these factors. *Id.* at 876, 154 P.3d at 447. The Court reasoned that

> the water rights adjudications neither address, nor answer, the questions presented in delivery calls; thus, responding to delivery calls, as conducted pursuant to the CM Rules, do [sic] not constitute a re-adjudication. For example, the SRBA court determines the water sources, quantity, priority date, point of diversion, place, period and purpose of use. I.C. §§ 42–1411(2)(a)–(j). However, reasonableness is not an element of a water right; thus, evaluation of whether a diversion is reasonable in the administration context should not be deemed a re-adjudication.

*Id.* at 876–77, 154 P.3d at 447–48 (case citation omitted). However, unlike the material injury factors discussed in *AFRD2*, the issue of whether the Curren Tunnel is a ground water or surface water source directly deals with the nature of Rangen's water right, which was addressed in the SRBA. Except for certain enumerated exceptions inapplicable here, "[t]he decree entered in a general adjudication shall be conclusive as to the *nature* and extent of all water rights in the adjudicated water system." I.C. § 42-1420 (emphasis added). Where the partial decrees indicate that Rangen's rights are surface water rights, that finding is conclusive in Rangen's delivery call.

11

IGWA alternatively argues that the Director erred in relying on Adjudication Rule 60 because the Curren Tunnel fits within the definition of ground water under the Ground Water Act and applying Rule 60 would conflict with the express terms of the Act. Under the Ground Water Act, ground water is defined as "all water under the surface of the ground whatever may be the geological structure in which it is standing or moving." I.C. § 42-230(a). According to IGWA, Adjudication Rule 60 cannot be construed in a manner that forces the Director to fallaciously administer a ground water source as if it is surface water, contrary to the plain language of the Act.

IGWA couches its argument as a conflict between the application of Adjudication Rule 60 and the definition of ground water in Idaho Code section 42-230(a). However, Adjudication Rule 60 does not address the definition of ground water or how the Director was to determine whether a specific source is ground water or surface water. Adjudication Rule 60 provides the naming conventions to be used once that determination is made. IDWR had authority to promulgate the Adjudication Rules under Idaho Code sections 42-1414 and 42-1805(8). IDAPA 37.03.01.000. Adjudication Rule 60's naming conventions provide a uniform system for the identification of surface and ground water sources which corresponds with the Legislature's intent for initiating the SRBA.

> Conjunctive management of ground water and surface water rights is one of the main reasons for the commencement of the Snake River Basin Adjudication . . . . To conjunctively manage these water sources a good understanding of both the hydrological relationship and legal relationship between ground and surface water rights is necessary.
> Although these issues may need to be resolved by general administrative provisions in the adjudication decrees, they generally relate to two classic elements of a water right—its source and priority. The SRBA should determine the ultimate source of the ground and surface water rights being adjudicated . . . . If the SRBA proceeds and these issues are not addressed, a major objective for the adjudication will not have been served. Conjunctive administration will be set back, and another generation of ground and surface water users will be uncertain regarding their relationship to each other.

*A & B Irrigation Dist. v. Idaho Conservation League*, 131 Idaho 411, 422, 958 P.2d 568, 579 (1997) (quoting INTERIM LEG. COMM. REP. ON THE SNAKE RIVER BASIN ADJUDICATION 36–37 (1994)). Adjudication Rule 60 provides a uniform standard for recording surface and ground water rights, which is essential for conjunctive management of those rights in the Snake River Basin.

IGWA is essentially arguing that the Curren Tunnel was miscategorized as a surface water source in the SRBA. However, Rangen's delivery call is not the appropriate place to challenge that determination. If IGWA wanted to challenge the partial decrees of Rangen's water rights it should have filed objections in the SRBA under Idaho Code section 42-1412. Allowing IGWA to collaterally attack this determination would severely undermine the purpose of the SRBA and create uncertainty in water rights adjudicated in that process. As this Court has previously stated, "[f]inality in water rights is essential." *State v. Nelson*, 131 Idaho 12, 16, 951 P.2d 943, 947 (1998). The partial decrees indicate that the Curren Tunnel is a surface water source and the decrees are conclusive on that issue. Therefore, Rangen's water rights are not subject to the provisions of the Ground Water Act.

We hold that the district court did not err in affirming the Director's conclusion that the Curren Tunnel was a surface water source and, therefore, not subject to the Ground Water Act.

## B. The District Court erred in vacating the Director's application of the Great Rift trim line.

At the district court, both Rangen and IGWA challenged the Director's implementation of the Great Rift trim line. IGWA argued that the curtailment area under the application of the Great Rift trim line was overly broad because it resulted in a waste of water and did not adequately account for model error. IGWA asked the district court to vacate the trim line and order the Director to adopt a smaller curtailment area. Rangen argued that the trim line should be vacated because the Director did not have discretion to apply a trim line at all in this case and the curtailment order should include all junior ground water pumping in the ESPA within the area of common ground water supply. The district court agreed with Rangen and vacated the trim line, concluding that the Director did not have discretion to apply a trim line on policy grounds and that applying the trim line based on model error impermissibly shifted the burden of proof on material injury from the junior appropriators to Rangen. On appeal, Pocatello challenges the district court's order vacating the trim line, arguing that the application of the Great Rift trim line was within the Director's discretion. Rangen and the Surface Water Coalition contend that the district court's decision should be upheld. IGWA argues that the district court should have ordered the Director to set a smaller curtailment area.

Here, the first issue is whether the Director had discretion to implement a trim line in this case. If the Director did have discretion, the next issue is whether the Director abused his discretion by implementing a trim line at the Great Rift.

13

## 1. The Director had discretion to implement a trim line based on the doctrine of beneficial use.

Relying on the Court's decision in *AFRD2*, the Director concluded that, given the nature of the decisions which must be made in determining how to respond to a delivery call, the Director must have discretion to impose a trim line if justified. *See AFRD2*, 143 Idaho at 880, 154 P.3d at 451. The Director then concluded that a trim line was justified in this case on two bases: (1) to ensure maximum and beneficial use of the State's water resources and (2) to account for uncertainty in ESPAM 2.1. We find that the Director had discretion to implement the trim line based on the policy of beneficial use. Therefore, we need not address whether the trim line was also justified to account for model uncertainty and whether implementing a trim line on that basis impermissibly shifted the burden of proof on material injury.

The Director concluded that in determining whether to implement a trim line, he must consider the diminishing benefits of curtailment beyond the Great Rift. The Director found that low transmissivity at the Great Rift impedes the transmission of water through the aquifer. Additionally, focusing on the results of ESPAM 2.1, the Director found that

> curtailment of junior ground water irrigation west of the Great Rift would curtail irrigation of approximately 157,000 acres, resulting in curtailment of irrigation of approximately 17,000 acres per cfs of predicted benefit to the Curren Tunnel. Curtailment of junior ground water irrigation east of the Great Rift would curtail irrigation of approximately 322,000 additional acres, resulting in curtailment of approximately 204,000 acres per cfs of predicted benefit to the Curren Tunnel.

In concluding that he must consider the diminishing benefits of curtailment, the Director relied on the policy considerations articulated in CMR 20.03, which provides that "[a]n appropriator is not entitled to command the entirety of large volumes of water in a surface or ground water source to support his appropriation contrary to the public policy of reasonable use of water." IDAPA 37.03.11.020.03. Additionally, the Director relied on the policy of promoting the optimum development of the State's water resources enunciated in Article XV, section 7 of the Idaho Constitution and this Court's decision in *Clear Springs*, where we stated that "[t]he policy of the law of this State is to secure the maximum use and benefit, and least wasteful use, of its water resources." *See* Idaho Const. art. XV, § 7; *Clear Springs*, 150 Idaho at 808, 252 P.3d at 89. Based on these considerations, the Director concluded that

> curtailment of ground water diversions on the east side of the Great Rift is not justified. To curtail junior ground water users east of the Great Rift would be counter to the optimum development of Idaho's water resources in the public

14

interest and the policy of securing the maximum use and benefit, and least wasteful use, of the State's water resources.

IGWA, Rangen, and Pocatello each sought reconsideration on various aspects of the Director's final order. On reconsideration, the Director upheld the application of the Great Rift trim line, reiterating the same policy considerations outlined above. Additionally, the Director concluded that the use of the Great Rift to define a trim line is justified based on the evidence presented in this proceeding and that the application of the trim line results in benefits to the calling party that are consistent with those resulting from trim lines applied in previous proceedings. The Director also concluded that in determining whether to implement a trim line he had to consider to what extent the prior appropriation doctrine, as established under Idaho law, allows a senior surface water user to call upon an aquifer to satisfy a senior water right. The Director found that the Great Rift trim line struck an appropriate balance.

On judicial review, the district court set aside the trim line, rejecting the Director's conclusions as to both the policy and model uncertainty grounds. The court observed that although the disparity between curtailed acreage and realized water accruing to the Martin-Curren Tunnel is large, the very nature of conjunctive management involves a large disparity between the number of acres curtailed and the accrued benefit to a senior right. The district court then found that under this Court's holding in *Clear Springs*, the Director could not rely on CMR 20.03 or Article XV, section 7 of the Idaho Constitution to implement a trim line and administer less than the full amount of water of which Rangen was entitled. The district court interpreted *Clear Springs* as holding that Idaho law does not

> provide the Director the discretion to reduce the decreed quantity of a water right to which a senior appropriator is entitled based on the disparity between the impact to junior ground water pumpers resulting from curtailment and the quantity of water that would benefit the senior right, provided the water is put to beneficial use.

On appeal, Pocatello argues that the Director had sufficient justification to implement the trim line in order to promote principles of optimum use, consistent with Idaho law. It argues that the disparity between the number of acres curtailed east of the Great Rift and the amount of water received by Rangen was large where the curtailment of an additional 322,000 acres was only predicted to accrue an additional 1.5 cfs of water to the Curren Tunnel. Pocatello also argues that the Director must have some amount of discretion to administer water in conjunctive

15

management situations and that setting aside the trim line in this case would essentially leave him with none.

The Director's arguments on appeal mirror the reasoning in his agency orders. In particular, the Director argues that

> in some circumstances, conjunctive management delivery calls can require idling hundreds of thousands of acres of productive agricultural land to deliver small increments of water to a senior water right holder. In such scenarios, the senior water right holder's private interest in receiving additional water may directly conflict with the public's interest in the optimum development of the State's water resources. Certain "bedrock" principles of Idaho's prior appropriation doctrine are launched into "tension." Here, the bedrock principles that are in tension are a water right holder's private proprietary interest in seeking curtailment of junior uses of water and the public's interest in the optimum development of the State's water resources. The Director has the statutory duty, authority, and discretion to resolve this tension.
>
> In this case, the Director resolved the tension through recognition of the Great Rift trim line . . . . [T]he Director concluded there is a point where Rangen's delivery call would require curtailment of vastly more acreage to produce a very small increment of additional water, and that at this point, Rangen's right to seek additional curtailment must give way to the public's interest in optimum development of the State's water resources. The Director also concluded that this point is the Great Rift.

The Surface Water Coalition and Rangen argue chiefly that Idaho's prior appropriation doctrine precludes the Director from imposing a trim line that takes water that would otherwise be put to beneficial use by a senior water right. They assert that the Director has no discretion to impose a trim line in this case because doing so would violate the prior appropriation doctrine and allow unmitigated injury to Rangen's senior water right. They further argue that the prior appropriation doctrine requires administration of all rights contributing to the material injury, subject only to a showing by the juniors that the call would be futile or otherwise unfounded.

The Court has previously held that hydrologically connected surface and ground waters must be managed conjunctively. *See Musser v. Higginson*, 125 Idaho 392, 871 P.2d 809 (1994). In 1994, IDWR promulgated the Conjunctive Management Rules ("CMRs") [IDAPA 37.03.11.000 to 37.03.11.050] to provide the procedures for responding to delivery calls "made by the holder of a senior-priority surface or ground water right against the holder of a junior priority ground water right in an area having a common ground water supply." IDAPA 37.03.11.001. The CMRs integrate "all elements of the prior appropriation doctrine as established by Idaho law." IDAPA 37.03.11.020.02 (CMR 20.02). The CMRs also integrate

16

administration and use of surface and ground water in a manner consistent with the traditional policy of reasonable use of both surface and ground water. The policy of reasonable use includes the concepts of priority in time and superiority in right being subject to conditions of reasonable use as the legislature may by law prescribe as provided in Article XV, Section 5, Idaho Constitution, optimum development of water resources in the public interest prescribed in Article XV, Section 7, Idaho Constitution, and full economic development as defined by Idaho law.

IDAPA 37.03.11.020.03 (CMR 20.03). Under these principles, "[a]n appropriator is not entitled to command the entirety of large volumes of water in a surface or ground water source to support his appropriation contrary to the public policy of reasonable use of water." *Id*. CMR 40.03 provides that, in a delivery call, "the Director shall consider whether the petitioner making the delivery call is suffering material injury to a senior-priority water right and is diverting and using water efficiently and without waste, and in a manner consistent with the goal of reasonable use of surface and ground waters as described in Rule 42."[1]  IDAPA 37.03.11.040.03.

"While the prior appropriation doctrine certainly gives pre-eminent rights to those who put water to beneficial use first in time, this is not an absolute rule without exception . . . the Idaho Constitution and statutes do not permit waste and require water to be put to beneficial use or be lost." *AFRD2*, 143 Idaho at 880, 154 P.3d at 451. In *AFRD2*, this Court concluded that the Director must have some discretion to balance these countervailing considerations in a delivery call.

> Somewhere between the absolute right to use a decreed water right and an obligation not to waste it and to protect the public's interest in this valuable commodity, lies an area for the exercise of discretion by the Director. This is certainly not unfettered discretion, nor is it discretion to be exercised without any oversight. That oversight is provided by the courts, and upon a properly developed record, the Court can determine whether that exercise of discretion is being properly carried out.

*Id*.

> Idaho  Code section 42-101 provides:
>
> > Water being essential to the industrial prosperity of the state, and all agricultural development throughout the greater portion of the state depending upon its just apportionment to, and economical use by, those making a beneficial application of the same, its control shall be in the state, which, in providing for its use, shall equally guard all the various interests involved.

---

[1] CMR 42 sets forth several factors for the Director to consider when determining whether holders of water rights are suffering injury and using water efficiently and without waste. *See* IDAPA 37.03.11.042.01(a)–(h).

As we recently stated in *Clear Springs*, the policy of securing the maximum use and benefit, and least wasteful use of Idaho's water resources, has long been the policy in Idaho.

> In *Niday v. Barker*, 16 Idaho 73, 79, 101 P. 254, 256 (1909), we stated, "The theory of the law is that the public waters of this state shall be subjected to the highest and greatest duty." In *Farmers' Co-operative Ditch Co. v. Riverside Irrigation District, Ltd.*, 16 Idaho 525, 535, 102 P. 481, 483 (1909), we phrased it, "Economy must be required and demanded in the use and application of water." In *Poole v. Olaveson*, 82 Idaho 496, 502, 356 P.2d 61, 65 (1960), we expressed the same concept by stating, "The policy of the law of this State is to secure the maximum use and benefit, and least wasteful use, of its water resources."

*Clear Springs*, 150 Idaho at 808, 252 P.3d at 89. This policy limits the prior appropriation doctrine by excluding from its purview water that is not being put to beneficial use. *AFRD2*, 143 Idaho at 876, 154 P.3d at 447. The policy of beneficial use serving as a limit on the prior appropriation doctrine dovetails with the prescription in CMR 20.03 that "[a]n appropriator is not entitled to command the entirety of large volumes of water in a surface or ground water source to support his appropriation contrary to the public policy of reasonable use of water." IDAPA 37.03.11.020.03.

Although ground water in the ESPA is hydraulically connected to water in the spring tributaries, the impact of ground water pumping in the ESPA on discharge in the springs is attenuated. *See* Douglas L. Grant, *The Complexities of Managing Hydrologically Connected Surface Water and Groundwater Under the Appropriation Doctrine*, 22 LAND & WATER L. REV. 63, 80–81 (1987). Necessarily, not all of the water collected due to the curtailment will accrue to the senior water right holder; some will remain in the aquifer and some will flow to other tributary springs. This complexity can make it very difficult to balance a senior right holder's interest in receiving additional water against the State's interest in securing the maximum use and benefit, and least wasteful use, of its water resources. In light of this challenging balancing requirement, it is necessary that the Director have some discretion to determine in a delivery call proceeding whether there is a point where curtailment is unjustified because vast amounts of land would be curtailed to produce a very small amount of water to the caller. As discussed, Idaho law contemplates a balance between the "bedrock principles" of priority of right and beneficial use. *In Matter of Distribution of Water to Various Water Rights Held By or For Benefit of A & B*

18

*Irrigation Dist.*, 155 Idaho 640, 650, 315 P.3d 828, 838 (2013). The Director is authorized to undertake this balancing act, subject, as he acknowledged here, to the limitations of Idaho law.[2]

The district court erred by rejecting the Director's reliance on CM Rule 20.03 and Idaho Constitution Article XV, section 7 as a basis to implement a trim line. The Director did not treat either source as directly granting him discretion to apply a trim line. Instead, the Director recognized, correctly, that each source merely restated a broader understanding of Idaho law: The prior appropriation doctrine sanctifies priority of right, but subject to limitations imposed by beneficial use.[3] The Director's interpretation of the law was correct and it was error for the district court to reject it.

The district court held that the Director does not have discretion to reduce the decreed quantity of water to which a senior appropriator is entitled based on the disparity between the number of acres curtailed and the quantity of water that would benefit the senior. First, the trim line here does not reduce the decreed quantities of Rangen's water rights. Rangen remains entitled to the full measure of its rights, subject to availability of water and beneficial use limitations. Rather, the trim line represents the Director's reasoned refusal to curtail irrigation to hundreds of thousands of acres so that Rangen might get another 1.5 cfs of water. Second, it is not the disparity per se between the impact to the juniors and the benefit to Rangen that justifies the trim line. Indeed, as the district court accurately and aptly noted, the very nature of conjunctive management involves a large disparity between the number of acres curtailed and the accrued benefit to a senior surface right. Nonetheless, the Director may consider any such disparity when seeking to balance priority of right with beneficial use requirements.

Holding that the Director has discretion to impose a trim line by applying the policy of beneficial use is consistent with Idaho law. In *Schodde v. Twin Falls Land & Water Co.*, a senior water right holder had erected water wheels to lift appropriated water out of a river so that he

---

[2] In determining whether to implement a trim line, the Director stated that he perceived the issue "as one of limited discretion." IGWA contends that the Director's use of the word "limited" indicates that the Director improperly limited his ability to evaluate whether Rangen's means of appropriation is reasonable and to prevent hoarding of water. However, as argued by IDWR, the Director's recognition that his discretion is limited is in line with the Court's holding in *AFRD2* that the Director's discretion in this area is "not unfettered." 143 Idaho at 880, 154 P.3d at 451. The Director's recognition that his discretion was limited does not mean that the director failed to recognize the issue as one of discretion, only that the Director recognized that he needed to express legal and factual support for his decision. This is not a situation where the Director failed to exercise any discretion.

[3] In *Clear Springs*, we held that "[t]here is no difference between securing the maximum use and benefit, and least wasteful use, of this State's water resources and the optimum development of water resources in the public interest." *Clear Springs*, 150 Idaho at 808, 252 P.3d at 89.

19

could divert it over his land. 224 U.S. 107, 114–115 (1912). A junior right holder had subsequently constructed a dam downstream, which backed up the river and reduced the current flow to the extent that the senior's water wheels could not operate. *Id.* at 115–116. The senior sued the junior in federal court, where the trial court dismissed the action and both the Ninth Circuit and the U.S. Supreme Court affirmed the dismissal. *Id.* at 114. The Supreme Court noted that

> [t]he trial court recognized fully the right of the plaintiff to the volume of water actually appropriated for a beneficial purpose. It nevertheless dismissed the complaint on the ground that there was no right under the Constitution and laws of the state of Idaho to appropriate the current of the river so as to render it impossible for others to apply the otherwise unappropriated waters of the river to beneficial uses. The Court . . . held that to uphold as an appropriation the use of the current of the river to the extent required to work the defendant's wheels would amount to saying that a limited taking of water from the river by appropriation for a limited beneficial use justified the appropriation of all the water in the river as incident to the limited benefit resulting from the use of the water actually appropriated.[4]

*Id.* at 117. "The extent of beneficial use [is] an inherent and necessary limitation upon the right to appropriate." *Id.* at 120. The Court acknowledged "the disastrous results which would follow" if the prior appropriation doctrine were not limited by beneficial use:

> If the plaintiff were permitted to own the current of the stream as appurtenant to his right of appropriation and diversion, he would be able to add indefinitely to the water right he would control and own. There might be a great surplus of water in the stream at and above plaintiff's premises, and an urgent demand for a portion of this surplus for beneficial uses, but if an appropriator above should divert a sufficient quantity to lower the current under plaintiff's water wheels so that they would not revolve, the plaintiff would have a cause of action to prevent such an appropriation. It is clear that in such a case the policy of the state to reserve the waters of the flowing streams for the benefit of the public would be defeated.

*Id.* It must be noted that *Schodde* dealt with the reasonableness of the senior appropriator's "means of diversion, not in his priority of water rights" (*Clear Springs*, 150 Idaho at 809, 252

---

[4] The *Schodde* quotes herein were originally stated by the trial court rather than the U.S. Supreme Court. However, the Supreme Court stated

> [w]e have freely excerpted from the opinions of the courts below because, in our judgment, they so clearly portray the situation, and correctly apply the law to that situation as resulting from the Constitution and statutes of Idaho and the reiterated decisions of the court of last resort of that state . . . that we might place our decree of affirmance upon the reasons which controlled the courts below.

*Schodde*, 224 U.S. at 121–122.

20

P.3d at 90), but the principles stated in *Schodde* apply equally in this water management case where the senior appropriator seeks to assert control over practically the entire aquifer, regardless of the minimal benefit to the senior and the great detriment to the juniors.

Another Idaho case is also instructive here. In *Van Camp v. Emery*, a senior appropriator had allegedly erected a dam to flood irrigate his lands, thereby depriving a junior appropriator of his water. 13 Idaho 202, 208, 89 P. 752, 754 (1907). The Court held:

> [i]n this arid country, where the largest duty and the greatest use must be had from every inch of water in the interest of agriculture and home building, it will not do to say that a stream may be dammed so as to cause subirrigation of a few acres at a loss of enough water to surface irrigate 10 times as much by proper application.

*Id.* Here, it will not do to say that access to an entire aquifer may be foreclosed so as to cause 1.5 cfs to accrue to a single tunnel at a loss of enough water to irrigate 322,000 acres.

In this case, the Director acted within the scope of his limited discretionary authority—"between the absolute right to use a decreed water right and an obligation not to waste it and to protect the public's interest in this valuable commodity" (*AFRD2*, 143 Idaho at 880, 154 P.3d at 451)—to impose the trim line at the Great Rift. We therefore hold that the district court erred in concluding that the Director did not have discretion to implement a trim line based on policy considerations and in vacating the trim line on that basis.

### 2. The Director did not abuse his discretion by implementing a trim line at the Great Rift.

IGWA argues that the Director abused his discretion by implementing the Great Rift trim line because the implementation of the Great Rift trim line results in a waste of water and the trim line fails to adequately account for model error.

#### a. The application of the Great Rift trim line does not result in a waste of water.

IGWA contends that the Director abused his discretion by setting a trim line that allows Rangen to "hoard" water in violation of the principle of beneficial use because Rangen is commanding one hundred times more water than it will use. IGWA believes that the Director's beneficial use and reasonable appropriation analysis were insufficient because the Director did not decide how much water Rangen can reasonably command without diverting it. Additionally, IGWA contends that the Director arbitrarily implemented the Great Rift trim line because it is inconsistent with the 10% trim line adopted in *Clear Springs*. Ultimately, IGWA wants the Court to set a minimum bar on how much water use can be curtailed without the benefit accruing to the

21

senior water right holder and to find that a curtailment area where only 0.63% of the benefits would accrue to the senior right holder is unreasonable.

As discussed above, the Director specifically considered the beneficial use doctrine in determining whether to implement a trim line at the Great Rift. The Director concluded that to curtail the junior ground water users east of the Great Rift would be counter to the optimum development of Idaho's resources in the public interest and the policy of securing the maximum use and benefit, and least wasteful use, of the State's water resources. With the implementation of the Great Rift trim line, curtailment was limited to an area where the Rangen cell was predicted to receive at least 1% and the Martin-Curren Tunnel was predicted to receive 0.63% of the benefits of the curtailment.

The Director did not set a minimum bar as to how much water can reasonably be curtailed in any delivery call but, rather, determined the point in this specific case where the benefit that would accrue to Rangen was so small in comparison to the acreage that would have to be curtailed so as to no longer justify curtailment. Concepts like beneficial use, waste, reasonable means of diversion and full economic development require a highly fact driven analysis. *AFRD2*, 143 Idaho at 869, 154 P.3d at 440. The circumstances that would justify a trim line and the point at which to implement it necessarily depend on the specific circumstances in each case. Setting a bright line rule dictating a minimum bar of what will be considered a reasonable curtailment area in future delivery calls would, therefore, not be appropriate.

Although Rangen would only receive 0.63% of the water accrued from the curtailment, that does not necessarily mean that the curtailment results in waste. Necessarily, not all of the water collected due to the curtailment will accrue to the senior water right holder, as some will remain in the aquifer or flow to other tributary springs. As discussed above, this is why it is necessary that the Director have some discretion to determine whether and at what point a delivery call would require curtailment of an unreasonably vast amount of acreage to produce a very small amount of water, and, therefore, not be justified. The Director's determination that this point was the Great Rift was reached through reason and supported by evidence on the record.

IDWR staff's analysis of ESPAM 2.1 results showed that the benefit of curtailment with respect to the number of acres curtailed diminished significantly where the benefit to the Martin-Curren Tunnel approached approximately 9.0 to 9.2 cfs. IDWR staff found that this point of

diminishing benefits corresponded with the location of the Great Rift, where low transmissivity impedes the transmission of water through the aquifer. The Director concluded that curtailment of junior ground water irrigation west of the Great Rift would result in curtailment of 17,000 acres per cfs predicted to benefit Rangen, while curtailment east of the Great Rift would result in curtailment of 204,000 acres per cfs predicted to benefit Rangen. The evidence on the record shows that there is a stark reduction in the benefit of the curtailment east of the Great Rift, compared to west of the Great Rift. If ground water pumping east of the Great Rift were included in the curtailment order, an additional 322,000 acres would be curtailed with only an additional 1.5 cfs predicted to accrue to the Curren Tunnel. Given the Director's discretion and these uncontested findings of fact, the Director's application of the Great Rift trim line was proper. It was not an abuse of discretion and it was supported by substantial evidence.

IGWA further contends that the Director should have adopted a 10% trim line because a 10% trim line was adopted in the Clear Springs Foods and Blue Lake Trout Farm delivery calls. There, the former Director found that the margin of error associated with ESPAM 1.1 was 10% and he excluded areas within that margin of error from the curtailment order. *Clear Springs*, 150 Idaho at 812–13, 252 P.3d at 93–94. Here, the Director specifically rejected IGWA's argument that he should impose a 10% trim line. Unlike ESPAM 1.1, ESPAM 2.1 is able to predict the impacts of curtailment on a single model cell rather than a multi-cell reach. As the Director found,

> [b]ecause the 10% trim line applied in Clear Springs delivery call was based on model predictions of impacts to a multi-cell reach containing several springs, applying a 10% trim line based on model predictions of impacts to a single model cell . . . would result in a significantly different standard than was applied in the Clear Springs delivery call.

IDWR staff found that if a 10% trim line were applied in the present case, the benefit that would accrue to the Rangen cell would be a negligible 0.01 cfs. Additionally, the trim line in Clear Springs was based on the Director's factual finding that the margin of error in ESPAM 1.1 was 10%. *Clear Springs*, 150 Idaho at 816, 252 P.3d at 97. Here, the Director was unable to quantify the margin of error in ESPAM 2.1. It does not make sense to impose a 10% trim line in this case because the margin of error in previous models was 10%. We find that a 10% trim line would not be reasonable when applied to the facts of this case.

Additionally, the Director specifically found that the benefit that would accrue to Rangen with the imposition of the Great Rift trim line was in line with prior delivery calls. It was

23

predicted that Rangen would receive 0.63% of the water accrued as a result of the curtailment order. The Director concluded that this was similar to the trim lines applied in the Clear Springs and Blue Lakes delivery calls, where the calling parties were predicted to receive 0.69% and 2% of the curtailed benefits, respectively. The Director's implementation of the Great Rift trim line was, therefore, not arbitrary.

We hold that the Director had substantial evidence to support his decision to implement the trim line at the Great Rift and that his decision to implement a trim line at that point does not result in a waste of water.

### b. *The Director did not fail to account for model error.*

IGWA contends that the Director abused his discretion by not considering localized model error when implementing a trim line. Additionally, IGWA argues that the Director erred in failing to account for the fact that ESPAM 2.1 overpredicts impacts to the Rangen cell. IGWA contends that the Director should have set a margin of error based on the above issues with the model and excluded all junior pumping within that margin of error from the curtailment order.

The Director found that ESPAM 2.1 was the best available scientific tool for predicting the effects of ground water pumping on discharge at the Rangen spring cell, although it was an imperfect approximation of a complex physical system. All of the parties agree that ESPAM 2.1 was the best scientific tool available. The Director addressed IGWA's arguments that the model did not account for localized error and was biased toward overpredicting impacts in the curtailment order. The Director found that IDWR staff disagreed that ESPAM 2.1 is biased towards overpredicting impacts.

> [A]rguments that the model is biased to over-predict impacts are based largely on comparison of model results with well and spring discharge data collected only after the year 2000. Ignoring data collected before 2000 compromises their interpretation . . . . Contrary to IGWA's arguments, evaluation of ESPAM 2.1's calibration results, which under-predict the difference between flows in the 1980s and the 2000s, suggests that the model would be more likely to under-predict the impacts of ground water pumping on springs flows in the Rangen cell.

Here, the Director did not fail to address bias in the model, but specifically rejected IGWA's argument that such bias existed. It seems that IGWA is asking the Court to reweigh the evidence of model bias and find that the Director lacked substantial evidence to support his finding that the model was not biased toward overprediction of flow. Although IGWA presented conflicting evidence, the findings of IDWR staff relied on by the Director provided substantial

24

evidence on the record to support the Director's finding that the model was not biased toward overpredicting water flow to the Rangen cell.

Additionally, the Director relied on an IDWR staff memorandum in concluding that although ESPAM 2.1 is a regional model, the discharge data for the Rangen cell reflects both local and regional geological controls on hydrologic responses to ground water pumping and other aquifer stresses. Also, based on findings from the IDWR staff, the Director concluded that it was appropriate to use a regional rather than a local model because the effect of junior ground water pumping in the ESPA on discharge in the spring reaches is a regional-scale question that cannot be addressed with a small-scale, local model. The Director rejected the application of alternative models suggested by IGWA's expert that "accounted for localized error," concluding that the calibration methods in those models did not follow proper procedures. The Director ultimately concluded that ESPAM 2.1 was the best available model because it incorporates much more information about the aquifer than can be considered in other predictive methods available to the Department, and it incorporates data that specifically reflect how spring discharge in the Rangen cell has responded to regional aquifer stresses in the past. The IDWR staff memorandum relied on by the Director provided substantial and competent evidence to support the Director's conclusion that ESPAM 2.1 was a more appropriate tool than the models that accounted for localized error and that it did account for local geological controls on hydrologic responses.

IGWA also argues that the Director erred in not setting a margin of error for ESPAM 2.1. Although the Director found that the model had some uncertainty, he found that because of the complexity of the model, the margin of error associated with the model predictions cannot be quantified. Both the ESHMC and IDWR staff had found that a predictive uncertainty analysis to determine a quantifiable margin of error could not be conducted in a reasonable timeframe. There was also expert testimony on the record stating that it would not be feasible in terms of resources or time to do the type of analysis necessary to come up with a reliable margin of error. Based on the foregoing, the Director had substantial evidence to support his finding that the uncertainty in ESPAM 2.1 could not be quantified, and he did not abuse his discretion by refraining from setting a numeric margin of error.

Accordingly, the Director did not abuse his discretion by failing to account for model error when implementing the Great Rift trim line.

25

**C. The District Court did not err in concluding that the Director provided a reasoned statement to support the curtailment order under Idaho Code section 67-5248(a).**

Idaho Code section 67-5248 provides that an agency order shall include "a reasoned statement in support of the decision" and "shall be accompanied by a concise and explicit statement of the underlying facts of record supporting the findings." I.C. § 67-5248(a). The order should "identify facts, as well as inferences drawn from the facts upon the application of its expertise and judgment, which underlie its decision. Such an explanation is essential to meaningful judicial review." *Woodfield v. Bd. of Prof'l Discipline of Idaho State Bd. of Med.*, 127 Idaho 738, 747, 905 P.2d 1047, 1056 (Ct. App. 1995).

IGWA alleges that the Director did not include a reasoned statement to support the curtailment order because the Director failed to make a determination of how much water Rangen can command without using. As discussed above, the Director did determine that expanding the curtailment order to ground water pumping east of the Great Rift would be unreasonable, and against the policy of maximum use and benefit of Idaho's water resources. The Director provided statements from the record to support his findings and identified which findings supported his conclusions of law. This is sufficient to meet the requirements of Idaho Code section 67-5248(a).

## V.
## CONCLUSION

We affirm the decision of the district court, save and except for the district court's vacation of the Great Rift trim line, which we reverse. We decline to award costs on appeal.

Justice BURDICK and Justice Pro Tem WALTERS CONCUR.


Justice EISMANN, concurring in the result with respect to Part B.

I concur in the majority opinion, but concur in the result with respect to Part B.

The majority states, "The Director then concluded that a trim line was justified in this case on two bases: (1) to ensure maximum and beneficial use of the State's water resources and (2) to account for uncertainty in ESPAM 2.1." The majority then states, "We find that the Director had discretion to implement the trim line based on the policy of beneficial use. Therefore, we need not address whether the trim line was also justified to account for model uncertainty . . . ." Thus, the majority holds that the distribution of water when there is a shortage

can be based entirely upon the Director's discretion "to ensure maximum and beneficial use of the State's water resources."

I do not read the Director's order as being based upon alternative grounds. Rather, it is clear that the director based his decision upon the inaccuracy of ESPAM 2.1 combined with the large number of acres that would be dried up if the software's prediction was incorrect. Before addressing why I concur in the result, I will address why I do not concur in Part B.

**A. The majority abandons the constitutional requirement of prior appropriation.**

The majority opinion in Part B abandons the constitutional requirement of first in time, first in right and states that the Director can apportion water in a manner "to ensure maximum and beneficial use of the State's water resources." "Under the provisions of section 3, art. 15, of the Constitution of this state, priority of appropriation gives the better right as between those using water." *Brose v. Bd. of Dirs. of Nampa & Meridian Irr. Dist.*, 20 Idaho 281, 285, 118 P. 504, 505 (1911). "This provision of the Constitution has been strictly adhered to in the many decisions this court has rendered construing the same, and this court has universally recognized the rule thus announced, that first in time of appropriation gives the first right to the use of water." *Id.*

The relevant part of Article XV, section 3, states: "The right to divert and appropriate the unappropriated waters of any natural stream to beneficial uses, shall never be denied, except that the state may regulate and limit the use thereof for power purposes. Priority of appropriation shall give the better right as between those using the water . . . ." As we stated in *In re Distribution of Water to Various Water Rights Held By or For Benefit of A & B Irrigation District*, 155 Idaho 640, 315 P.3d 828 (2013), we stated, "The prior appropriation doctrine is comprised of two bedrock principles—that the first appropriator in time is the first in right and that water must be placed to a beneficial use." *Id.* at 650, 315 P.3d at 838.

The water rights of Rangen, Inc. ("Rangen"), at issue are surface water rights, which "shall never be denied" under the Constitution. "However, the Constitution makes no mention of ground water rights." *Clear Springs Foods, Inc. v. Spackman*, 150 Idaho 790, 801, 252 P.3d 71, 82 (2011). Thus, it is Rangen's water rights that are protected by the Constitution, not the competing water rights of ground water appropriators. There is no contention that Rangen is not applying the water it diverts to a beneficial use.

We have held that a water user can be required to change the water user's manner of diversion if it is unreasonable, *Van Camp v. Emery*, 13 Idaho 202, 89 P. 752 (1907), as did the Supreme Court in *Schodde v. Twin Falls Land & Water Co.*, 224 U.S. 107 (1912). There is no contention that Rangen's manner of diversion is unreasonable.

The majority stretches these two cases to hold that the Director has authority to distribute water not based upon priority, but based solely upon the Director's understanding of "the maximum and beneficial use of the State's water resources." The Director does not have the discretion to ignore the Constitution, nor does the majority. Under the majority opinion, water need no longer be distributed according to priority, which means that no one's water rights are secure. "Priority in time is an essential part of western water law and to diminish one's priority works an undeniable injury to that water right holder." *Jenkins v. State, Dep't of Water Res*., 103 Idaho 384, 388, 647 P.2d 1256, 1260 (1982).

**B. The majority changes the meaning of the words "beneficial use."**

In order to eliminate the doctrine of prior appropriation, the majority changes the meaning of the words "beneficial use" so that it becomes a discretionary determination by the Director comparing the relative financial benefits of the senior appropriator using his decreed water versus the loss sustained by the junior appropriators. That is not the meaning of "beneficial use" as that term is used with respect to water rights.

We have previously explained that "beneficial use" does not mean the equitable distribution of water. As we stated in *Drake v. Earhart*, 2 Idaho 750, 23 P. 541 (1890):

> ["]No distinction is made in those states and territories, by the custom of miners or settlers or by the courts, in the rights of the first appropriator from the use made of the water, if the use be a beneficial one." In this case it is said: "The right of the first appropriator, exercised within reasonable limits, is respected;" that it "is not unrestricted. It must be exercised with reference to the general condition of the country, and the necessities of the people." *This language has been seized upon as justifying the equitable, if not equal, division of the water among all desiring or needing it, regardless of the claim of the prior appropriator. Such a construction is not justified*, and would make the decision inconsistent with itself, as well as with the other decisions of the same court.

*Id*. at 756, 23 P. at 543 (emphasis added).

It is clear that "beneficial use" refers to how the appropriator uses the water, not whether other uses would be more beneficial. When the water is diverted from a watercourse, beneficial use means how the appropriator uses it *after* diverting the water. Article XV, section 3, begins,

28

"The right to *divert and appropriate* the unappropriated waters of any natural stream *to beneficial uses*, shall never be denied . . . ." The diversion came first and then the application of the water to a beneficial use. As we explained in *United States v. Pioneer Irrigation District*, 144 Idaho 106, 110, 157 P.3d 600, 604 (2007):

> In Idaho it is "a well-settled rule of public policy that the right to the use of the public water of the state can only be claimed where it is applied to a beneficial use in the manner required by law." Under the constitutional method of appropriation, appropriation is completed upon application of the water to the beneficial use for which the water is appropriated. When following the constitutional method, one "must depend upon actual appropriation, that is to say, *actual diversion and application to beneficial use*." Under the statutory method of appropriation, the appropriation is not complete and a license will not issue *until there is proof of application to beneficial use for the purpose for which it was originally intended*. I.C. §§ 42–217, 42–219. Under either the constitutional or statutory method of appropriation, *the appropriator must apply the water to a beneficial use in order to have a valid water right in Idaho*.

144 Idaho at 110, 157 P.3d at 604 (emphases added). To reiterate, "Under either the constitutional or statutory method of appropriation, the appropriator must *apply* the water to a beneficial use in order to have a valid water right in Idaho." *Id*. (Emphasis added).

We discussed what constituted "beneficial use" in *Clear Springs Foods*:

> The right to appropriate water is for "beneficial uses," not merely for profitable businesses. Beneficial use is not defined in the Constitution, nor has it been comprehensively defined by statute or by this Court. However, a beneficial use is not limited to a use that generates a profit, or even income. For example, the Constitution lists using water for "domestic purposes" as a beneficial use. We have held that "firefighting" is a beneficial use of water. Likewise, the legislature has declared as beneficial uses "drinking water," "the watering of domestic livestock," using low temperature geothermal resources "primarily for heat value," using instream water "for the protection of fish and wildlife habitat, aquatic life, recreation, aesthetic beauty, transportation and navigation values, and water quality," and using water in lakes and water discharging from springs for "scenic beauty."

*Clear Springs Foods*, 150 Idaho at 811, 252 P.3d at 92 (citations omitted). All of these beneficial uses were the manner in which the appropriator used the water appropriated. It was not comparing the benefit to the senior appropriator and the harm to the junior appropriator from applying the constitutional provision of priority of appropriation.

The framers of our Constitution understood that the most beneficial use of water required distributing water in accordance with the priority of water rights—first in time, first in right. As this Court stated in *Hard v. Boise City Irrigation & Land Co*., 9 Idaho 589, 76 P. 331 (1904):

It is certainly unnecessary for us to suggest that it was the evident intent of the framers of the Constitution to so husband the water of the state as *to secure the most beneficial use thereof*; that is, that it should always be so used as to benefit the greatest number of inhabitants of the state. *They were careful to provide who should be entitled to the preference right to the use of the waters flowing in our natural streams.*

Nearly every session of our Legislature has attempted to improve upon its predecessor by so legislating as to improve the former use of water, and an inspection of the various acts plainly shows that the guiding star has always been to so legislate as to *protect all users of water in the most useful, beneficial way— keeping in view the rule existing all over the arid region: "First in time first in right."*

*Id*. at 594, 76 P. at 332 (emphases added). The maximum beneficial use of water requires certainty as to water rights, not, as the majority holds, the right of the Director to distribute water according to his discretion. Indeed, the majority does not even give any guidelines as to how the discretion it grants to the Director is to be exercised.

There is no contention that Rangen is not applying the water it diverts to a beneficial use and cannot apply water to the extent of its water right to a beneficial use. Thus, the doctrine of beneficial use cannot be used to determine the amount of water it is entitled to receive. Whether a particular appropriator is applying water to a beneficial use is based entirely upon what the appropriator is doing with the water. What others may do with it has no bearing.

Rangen's right to obtain the amount of water that has been decreed cannot be based upon comparing the harm to junior appropriators and the benefit to Rangen. As we held in *Clear Springs Foods*, "A delivery call cannot be denied on the ground that curtailment of junior appropriators would result in substantial economic harm." 150 Idaho at 803, 252 P.3d at 84.

Such a comparison in this case would stack the deck against Rangen. There is no evidence that the water the junior appropriators would be unable to divert would be wasted. If we were to institute the balancing test advocated by the majority, we must compare the juniors against all of those holding senior water rights who are not obtaining all the water to which they are entitled based upon the juniors' diversions. Rangen sought to introduce that evidence in the administrative proceeding, but the Director held it as irrelevant. If the Court is going to engage in that balancing test under the rubric of "beneficial use," then the balancing should include all of the seniors who are not receiving their appropriated water.

C. **The conjunctive management rules cannot alter the Constitution.**

The majority relies upon conjunctive management rules to support its abandonment of the prior appropriation doctrine. Administrative rules cannot modify the Constitution. The majority relies upon Conjunctive Management Rule 20.03, which states, "An appropriator is not entitled to command the entirety of large volumes of water in a surface or ground water source to support his appropriation contrary to the public policy of reasonable use of water . . . ." That rule must be construed in a manner that upholds its constitutionality. *American Falls Reservoir Dist. No. 2 v. Idaho Dep't of Water Res*., 143 Idaho 862, 869, 154 P.3d 433, 440 (2007). As we stated in *Clear Springs*, that can only apply to the means of diversion.

> Conjunctive Management Rule 20.03 states, "An appropriator is not entitled to command the entirety of large volumes of water in a surface or ground water source to support his appropriation contrary to the public policy of reasonable use of water . . . ." That is consistent with our holding in *Van Camp.* The senior appropriator in *Van Camp* was entitled to his water right; he simply had to change his unreasonable means of diversion. As we stated, "Whatever amount of water defendant shows himself entitled to for the irrigation of his meadows or other lands as a prior right over the plaintiff, the judgment should so decree, but beyond that he cannot go under any other pretext or claims for the natural condition of the stream." *Id.*

*Clear Springs Foods*, 150 Idaho at 809, 252 P.3d at 90.

As we also stated in *Clear Springs Foods*:

> A delivery call cannot be denied on the ground that curtailment of junior appropriators would result in substantial economic harm. Such a holding would be contrary to the provision in Idaho Code § 42-233a (emphases added), stating:The director, upon determination that the ground water supply is insufficient to meet the demands of water rights within all or portions of a critical ground water area, shall order those water right holders *on a time priority basis,* within the area determined by the director, *to cease or reduce withdrawal of water* until such time as the director determines there is sufficient ground water.

> In this case, it would also be contrary to Article XV, § 3, of the Idaho Constitution, which states, "Priority of appropriation shall give the better right as between those using the water . . . ."

*Id.* at 803, 252 P.3d at 84.

### D. Following the Constitution is not wasting water.

"We have long recognized that an appropriator may not waste water, but must permit others to use the water when the appropriator is not applying it to a beneficial use." *Joyce Livestock Co. v. United States*, 144 Idaho 1, 15, 156 P.3d 502, 516 (2007). However, the policy

against waste does not permit a junior appropriator to take water before it would reach the senior appropriator.

In *Martiny v. Wells*, 91 Idaho 215, 419 P.2d 470 (1966), we addressed the issue of whether an upstream junior appropriator could deprive a senior appropriator of irrigation water due to significant conveyance losses in spring water reaching the creek from which the senior diverted water. The creek flowed through a swampy area that was fed by springs on both sides, and the junior appropriator constructed a ditch between the creek and the springs on one side of the creek to catch the water. *Id*. at 216, 419 P.2d at 471. The ditch was the junior's only diversion. *Id*. There was a dispute as to how much water from the springs would actually reach the creek, and the district court found that "only a portion of the flow of the springs reaches Spring Creek," although it did not quantify what that portion was. *Id*. at 216-17, 419 P.2d at 471-72. However, the court did find that the "best use of the water flowing from the springs and the swampy area around the [junior's] ditch is the collection of said water in the [junior's] ditch for irrigation of the property served by said ditch." *Id*. at 217, 419 P.2d at 472. We reversed the district court, stating:

> Under the facts involved in this case, the court's conclusion that the best use of the water was the use made of it by defendant, is immaterial and lends no support to the judgment. The policy of the law against the waste of irrigation water cannot be misconstrued or misapplied in such manner as to permit a junior appropriator to take away the water right of a prior appropriator. So long as the water from the springs and swamps, flowing in its natural channels, *would reach Spring Creek in usable quantities, plaintiffs are entitled to enjoin defendant's interference therewith. The fact that some of the water would be lost by evaporation or percolation would not afford this defendant any right to divert it.*

*Id.* at 219, 419 P.2d at 474 (emphasis added). As we stated in *Martiny*, the junior appropriator cannot take the water as long as the water would reach the senior appropriator "in usable quanties." *Id*.

We reiterated that holding in *Gilbert v. Smith*, 97 Idaho 735, 552 P.2d 1220 (1976), wherein we stated:

> As a rule, the law of water rights in this state embodies a policy against the waste of irrigation water. Such policy is not to be construed, however, so as to permit an upstream junior appropriator to interfere with the water right of a downstream senior appropriator *so long as the water flowing in its natural channels would reach the point of downstream diversion.*

32

*Id.* at 739, 552 P.2d at 1224 (emphasis added). We added that a junior appropriator could take the water only if "due to seepage, evaporation, channel absorption or other conditions beyond the control of the appropriators the water in the stream will not reach the point of the prior appropriator in sufficient quantity for him to apply it to beneficial use." *Id.*

There is no contention that Rangen is wasting the water it is diverting. The only issue is whether water being taken by junior appropriators would reach Rangen's point of diversion in sufficient quantity for him to apply it to beneficial use.

### E. I concur in the result with respect to Part B of the majority opinion.

As I stated above, it is clear that the Director based his decision upon the inaccuracy of ESPAM 2.1 combined with the large number of acres that would be dried up if the software's prediction was incorrect.

The Director found that ESPAM 2.1 is "an imperfect approximation of a complex physical system," but it was the best scientific tool currently available for predicting the effects of groundwater pumping on the discharge at the Rangen model cell. That cell is not simply the Curren Tunnel from which Rangen obtains water, but the Director found that 63% of the curtailment benefits accruing to the model cell would accrue to the tunnel. In reaching his decision, the Director took into consideration the inaccuracy of ESPAM 2.1 in predicting the water that would flow to the Curren Tunnel if pumping east of the Great Rift were curtailed. The Director stated:

> There is generally higher predictive uncertainty on the eastern side of the Great Rift, however impacts from several pumping locations evaluated on the eastern side of the Great Rift had negligible impacts on the spring cell evaluated in the Department's predictive uncertainty analysis. Uncertainty in the model justifies use of a trim line.

We held in *Clear Springs Foods* that the Director has the discretion to establish a trim line based upon uncertainty in the computer model. We stated:

> The Director concluded that there was up to a 10% margin of error in the groundwater model due to the margin of error in the stream gauges, and he decided not to curtail appropriators who were within that margin of error when deciding whether they were causing material injury to the Spring Users' water rights. The Director perceived the issue as discretionary, he acted within the outer limits of his discretion and consistently with the legal standards applicable to the available choices, and he reached his decision through an exercise of reason. The district court did not err in upholding the Director's decision in this regard.

150 Idaho at 817, 252 P.3d at 98.

33

In this case, the Director set the trim line at the Great Rift. Model uncertainty is the only constitutional basis for doing so.

Justice HORTON CONCURS.